NANCY HOFFMEIER ZAMORA (State Bar No. 137326)
U.S. Bank Tower
633 West 5th Street, Suite 2600
Los Angeles, California   90071
(213) 488-9411   FAX:  (213) 488-9418
e-mail: zamora3@aol.com

Chapter 7 Trustee

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re | Case No. 1:25-bk-10617-MB |
| HOVHANNES NAZARYAN, | Chapter 7 |
| Debtor. | REPLY TO OPPOSITION TO "MOTION FOR ORDER AUTHORIZING TRUSTEE TO SELL REAL PROPERTY FREE AND CLEAR OF LIENS AND INTERESTS (EXCEPT L.A. COUNTY HERO LIEN), SUBJECT TO OVERBID, AND APPROVING SURCHARGE FOR ADMINISTRATIVE FEES AND EXPENSES PER 11 U.S.C. §506(c)"; SUPPORTING DECLARATION |
| | DATE: July 16, 2025 |
| | TIME: 11:00 a.m. |
| | CTRM: 303 |

TO THE HONORABLE MARTIN R. BARASH, UNITED STATES BANKRUPTCY JUDGE, UNITED STATES TRUSTEE, OPPOSING CREDITOR, AND OTHER INTERESTED PARTIES:

Nancy Hoffmeier Zamora, Chapter 7 Trustee ("Trustee") of the estate (the "Estate") in the above-referenced case (the "Case") of debtor Hovhannes Nazaryan ("Debtor"), files this reply (the "Reply") to the Opposition (the "Opposition") [dkt. no. 79] filed by creditor Mehran Javaherian ("Opposing Creditor") to the Motion for Order Authorizing Trustee to Sell Real Property Free and Clear

Nazaryan\reply.001

of Liens and Interests (Except L.A. County HERO Lien), Subject to Overbid, and Approving Surcharge for Administrative Fees and Expenses per 11 U.S.C. §506(c) (the "Sale Motion") [dkt. no. 63].

## I.  INTRODUCTION

This case is a bit of an oddity.  It starts out with a debtor who is currently serving time for bank fraud in federal prison.  Unusual though it may be, this is not what makes the instant case such an anomaly, however.  What classifies the instant case as an outlier is an attempt by a business associate of the debtor to disrupt an orderly sale of the estate's key asset, certain real property located in Calabasas, California.

Upon taking possession of the real property, Trustee, consistent with past practice, conducted a preliminary investigation of the real property, which included a thorough analysis of the liabilities burdening the real property.  At the same time, Trustee took action to preserve the real property and its value by obtaining insurance, engaging personnel to maintain the premises of the real property, removing unauthorized residents of the real property, preparing the real property for sale, and finding a buyer.  Not once did Opposing Creditor object to any of Trustee's actions during this critical time in the estate's administration.

Rather, Opposing Creditor waited until Trustee was preparing to file her motion for sale to file his motion for relief from stay.  Opposing Creditor was able to time the filing of his motion because Trustee kept Opposing Creditor fully informed of her administration relative to the real property.

. . . . .

2.

Nazaryan\reply.001

Trustee filed the motion for sale pursuant to painstaking negotiations with secured creditors who all agreed, in the end, that Trustee's motion for sale was the best possible result given the circumstances of Debtor's bankruptcy.  Not so, according to Opposing Creditor, who, as it turns out, actively pursued various parties to the motion for sale in an attempt to unravel Trustee's fully-negotiated sale of the real property.

Opposing Creditor's long-standing history with Debtor is a bramble of back-and-forth self-dealing that culminated in Debtor's bankruptcy filing.  Opposing Creditor criticizes Trustee's administration while asking the Court to ignore the terrible judgment he exercised in extending his loan (assuming the laws of gravity apply), the defaults Opposing Creditor ignored and the huge fees he extracted from his loan to Debtor.  Now, as the real property is readied for sale, Opposing Creditor wants to collect, but exactly for whom is unclear, as Debtor pursues his motion to dismiss which, if successful, would relegate the bankruptcy system to a mere weigh station in the sequence of events tied to this real property.

Trustee has operated in good faith since the inception of this Case and will continue to do so.  The initial purchase agreement would have paid Opposing Creditor approximately $845,000.00 of the principal of his loan (approximately 70%).  Pursuant to Trustee's additional efforts and negotiations, the estimated payout to Opposing Creditor is now $1,171,051.01.  This amount, when added to the prior payments Opposing Creditor received, exceeds the full loan principal of $1,200,000.00.

. . . . .

3.

Nazaryan\reply.001

## II.   FACTUAL BACKGROUND

Trustee provided relevant facts in the Sale Motion.  However, the Opposition includes additional facts and arguments that require Trustee to supplement the factual background for the Court.  These facts follow *infra.*

### A.   Opposing Creditor's Loan

1.   Opposing Creditor and his financial advisor/brother, Benjamin Javaherian ("Benjamin"), have a long-time relationship with Debtor and Debtor's brother, Artur Nazaryan ("Artur").  Both Debtor and Artur are serving federal prison sentences for conspiracy to commit bank fraud.

2.   Opposing Creditor admits in one of his declarations [see dkt. no. 56 at page 14] that the loan of $1.2 million he made to Debtor and Artur in 2023 was used in large part to pay off the then-existing loan secured by the Real Property (defined below) that was owed to Benjamin through his company, Iled, Inc.  (N.B. In the escrow statement for the loan escrow, the loan payoff of $506,433.89 was made to Hye Rise Inv., LLC and the deed of trust recorded on January 21, 2022 as instrument no. 20220080259 in the Official Records, Recorder's Office, Los Angeles County, California ("Official Records") names Hye Rise Inv., LLC as beneficiary.) Trustee could find no information about these entities as owned by Benjamin at the Secretary of State's website.

3.   The loan documents stated that Debtor and Artur were to use funds from Opposing Creditor's loan for "business purposes" to pay off debt.  Opposing Creditor received $24,000.00 in lender's fees from the principal amount of the loan at its inception.  The amount of $292,348.09 was disbursed to borrowers Artur ($40,000.00)

4.

and Debtor ($252,348.09) from the loan.  There is no explanation in the loan documents of how these funds were used for "business purposes".

4.   Opposing Creditor admits in his declaration [see dkt. no. 56 at page 14] that he only received one payment of $12,000.00 on account of the $1.2 million loan he made.  Until recently, Opposing Creditor made no efforts to collect payments.  He waited for 18 months after the date of the loan, and 4 months after the loan was fully due and payable, to even begin such efforts.

**B.**   **Estate Administration**

5.   On the petition date of April 14, 2025, Opposing Creditor's first counsel ("First Counsel") contacted Trustee about the Case and the real property commonly known as 24366 La Masina Court, Calabasas, California 91302 (the "Real Property").  First Counsel raised concerns with Trustee about persons who were occupying the Real Property, the condition of the Real Property, Debtor's listing of the Real Property on the multiple listing service ("MLS"), and that Debtor, through third parties, may be causing waste of, or intentional damage to, the Real Property.

6.   Trustee immediately commenced investigation of the Real Property, requested that Debtor's MLS listing be cancelled by Debtor's realtor, contacted Debtor's counsel, contacted Trustee's realtor ("Estate Broker") to evaluate the Real Property, communicated with the management company for the homeowners association ("HOA"), obtained real property documents, and conducted other due diligence.

7.   Trustee had to secure and safeguard the Real Property. Trustee obtained liability and hazard insurance.  Upon confirming

5.

Nazaryan\reply.001

that there were "invitees" occupying the Real Property, Trustee engaged special counsel specializing in landlord-tenant and eviction law to follow the necessary procedures to end the invitees' possession of the Real Property and ensure their removal of any of their personal property.

8. From the commencement of the Case, Trustee communicated with various parties including lienholders and/or their counsel to obtain information about the Real Property as it was obvious Debtor's schedules were inaccurate and unreliable. Trustee made numerous requests of Debtor's counsel for documents and information, most of which were unavailable or non-existent.

9. Trustee proceeded without delay in order to minimize costs to the Estate and to negotiate one or more "carve-outs" from secured creditors to maximize value for all secured and unsecured creditors in the Case.

10. Trustee negotiated, in good faith, with First Counsel regarding Trustee's administration of the Real Property and believed that progress was being made. It was not until the eve of the hearing on Debtor's motion to compel abandonment that there was a sudden shift in attitude by Opposing Creditor when current counsel substituted into the matter. Yet, Trustee believed, based on further communications, that a global resolution with all secured creditors would result in Trustee's sale of the Real Property and a benefit to unsecured creditors.

. . . . .

. . . . .

. . . . .

. . . . .

6.

Nazaryan\reply.001

**III.   SUMMARY OF REPLY**

**A.   <u>The Applicable Statutes and Case Law Compel the Court to Overrule the Opposition which Lacks Merit</u>**

**1.   Trustee Satisfies 11 U.S.C. §363(f)(5) as to Opposing Creditor**

First, Opposing Creditor asserts that Trustee referred to judicial and nonjudicial foreclosure proceedings and tax lien sales without citing specific California statutes in the Sale Motion. Opposing Creditor argues that the absence of specific citations is enough to deny Trustee's Sale Motion and that Trustee cannot prevail under 11 U.S.C. §363(f)(5).

Opposing Creditor cites no authorities for this odd assertion. In fact, there was a thorough discussion in the Sale Motion of the legal or equitable proceedings by which Opposing Creditor could be compelled to accept a money satisfaction of his interest, satisfying §363(f)(5).  Opposing Creditor ignores this discussion in the Sale Motion and insists that Trustee is required to provide specific citations in her argument for support of the sale.

There is no such requirement in §363(f)(5). Nevertheless, in the Argument section of this Reply, *infra*, Trustee provides specific citations for the applicable statutes related to judicial and nonjudicial foreclosure sales and tax lien sales.  Hopefully, this will provide Opposing Creditor with the information he seeks.

**2.   Sale Proceeds of $40,000.00 for Unsecured Creditors is a Meaningful Distribution under the Circumstances**

Second, Opposing Creditor complains that Trustee cannot show that there is a prospect for meaningful distribution to unsecured creditors of the Estate from the proposed sale.

7.

Nazaryan\reply.001

Trustee argues that $40,000.00 is sufficient to provide the prospect of a meaningful distribution to allowed unsecured creditors under the facts, circumstances, and case law governing this Case, consistent with distributions regularly approved by bankruptcy courts.

**3.   Trustee and the Estate are Entitled to Recovery of Administrative Fees and Expenses from the Sale Proceeds**

Third, Opposing Creditor suggests that administrative fees and expenses directly related to, and incurred for, the protection, preservation, and disposition of the Real Property do not benefit secured creditors and should not be paid from the sale proceeds.

This argument fails insofar as it directly contradicts the plain language of 11 U.S.C. §506(c) and applicable case law. Trustee is entitled to recover the reasonable and necessary costs of preservation and disposition of the Real Property.

**IV.   ARGUMENT**

**A.   11 U.S.C. §363(f)(5) and Applicable Case Law Compel the Court to Overrule Opposing Creditor's Objection and Approve Trustee's Sale of the Real Property**

Trustee may sell the Real Property pursuant to 11 U.S.C. §363(b) free and clear of Opposing Creditor's lien in the Real Property because Opposing Creditor "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."  Trustee can satisfy 11 U.S.C. §363(f)(5).  Thus, the Court must approve Trustee's sale of the Real Property.

Opposing Party argues that Trustee did not cite specific California statutes in the Sale Motion. Opposing Party ignores Trustee's identification, in the Sale Motion, of judicial or

8.

Nazaryan\reply.001

nonjudicial foreclosure sales under California state law and tax lien sales under applicable state or federal law that satisfy the requirement for a legal or equitable proceeding, as set forth in 11 U.S.C. §363(f)(5).  In these legal or equitable proceedings, as discussed in the Sale Motion, Opposing Creditor could be compelled to accept a money satisfaction for the Second TD that is junior to the real property tax lien, the L.A. County HERO Lien (defined below), the Los Angeles Police Federal Credit Union ("LAPFCU") judgment lien ("LAPFCU Lien"), and the first trust deed (the "First TD") of AmWest Funding Corp. ("Amwest").

**1.    Several Specific Statutes Provide the Basis to Apply 11 U.S.C. §363(f)(5) to Sell Free and Clear of Second TD**

**a.    California Nonjudicial Foreclosure Statutes**

California nonjudicial foreclosure law is enacted at California Civil Code §§2924 - 2924k and provides a comprehensive framework for the regulation of nonjudicial foreclosure sales pursuant to the power of sale provisions in deeds of trust.  Liens that attached to the property after execution of the foreclosed deed of trust are eliminated or sold out, and the purchaser at the trustee sale takes title to the property free of those junior liens.  AmWest holds the First TD that is senior to the Second TD and could conduct a nonjudicial foreclosure sale.  Such a nonjudicial foreclosure sale would compel Opposing Creditor to accept a money satisfaction, even if less than the full amount he claimed.

**b.    California Judicial Foreclosure Statutes**

California judicial foreclosure law allows a foreclosing senior lienholder to remove liens from the subject property that

Nazaryan\reply.001

are junior to the one being foreclosed if the junior lienholders are made parties to the action. *See* California Code of Civil Procedure ("CCP") §725a - §730.5.    The recorded Notice of Assessment for the L.A. County HERO Loan (the "L.A. HERO Lien") specifically states in paragraph 5 of Exhibit C to the Notice of Assessment, recorded in Official Records, that the amount of the subject assessment and other related amounts constitute a lien against the Real Property having the priority set forth in Chapter 29 of Part 3 of Division 7 of the California Streets and Highways Code and may be enforced through a judicial foreclosure action. Such a judicial foreclosure sale would compel Opposing Creditor to accept a money satisfaction, even if less than the full amount he claimed.

### c.    California Real Property Tax Lien Statute

The real property tax sale statutes that relate to Los Angeles County real property taxes are another example of a legal or equitable proceeding under applicable California law.    *See* California Revenue & Taxation Code ("Cal. Rev. & Tax. Code") §§2187, 3691, 3692.  Such a tax sale would compel Opposing Creditor to accept a money satisfaction, even if less than the full amount he claimed.

### d.    Federal Tax Lien Statute

A federal tax lien sale pursuant to 26 U.S.C. §§6335, 6339©, and 6342© provides an example of a legal or equitable proceeding by which Opposing Creditor could be compelled to accept a money satisfaction for the Second TD if such a tax lien existed.

### e.    Enforcement of Judgment Lien

A recorded abstract of judgment, like the LAPFCU Lien that is

10.

Nazaryan\reply.001

senior in priority to the Second TD, can be enforced by sale of real property. *See* CCP §§680.010 - 724.260.  Such a sale would compel Opposing Creditor to accept a money satisfaction, even if less than the full amount he claimed.

All of these citations provide statutory authority for legal or equitable proceedings by which Opposing Creditor could be compelled to accept a money satisfaction, even if less than the amount he claims.  These citations support Trustee's argument in the Sale Motion and the conclusion she reached that she can sell the Real Property, free and clear of the Second TD, pursuant to 11 U.S.C. §363(f)(5).

2.    ***Clear Channel* is Distinguishable and this Court Should Adopt a "Middle Ground" Interpretation that §363(f)(5) Encompasses Any Realistic Legal or Equitable Proceeding that Could Compel Interest Holders to Accept a Money Satisfaction**

a.    **Distinctions Between *Clear Channel* and this Case**

The narrow holding in *Clear Channel* does not apply to the instant Case.  The Bankruptcy Appellate Panel ("BAP") held that a chapter 11 trustee's §363 sale could not be approved outside a plan of reorganization to permit a secured creditor to credit bid its debt to purchase estate property, taking title free and clear of nonconsenting junior liens, by referencing the cramdown mechanism of 11 U.S.C. §1129 as the "legal proceeding" to satisfy the requirement of §363(f)(5).

The instant Case is in Chapter 7, not Chapter 11.  The equitable or legal proceeding to satisfy the requirement of §363(f)(5) is a judicial or nonjudicial foreclosure sale, or a

11.

Nazaryan\reply.001

judgment lien sale, or a tax lien sale under California statutory law, not 11 U.S.C. §1129.

Opposing Creditor erroneously argues that *Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)*, 391 B.R. 25 (BAP 9th Cir. 2008) controls the outcome of the instant case in favor of his objection. As summarized *supra* and further discussed *infra*, it does not.

In the Sale Motion, Trustee distinguishes *Clear Channel* from the instant Case and cites other case decisions that support this Court's approval of Trustee's proposed sale over any objection from Opposing Creditor by applying 11 U.S.C. §§363(f)(5) and 506(a). The Opposition offers nothing to contradict or provide a different interpretation of any of the cases Trustee cites in support of the Sale Motion. *See In re Jolan,* 403 B.R. 866 (Bankr. W.D. Wash. 2009); *In re Boston Generating, LLC*, 440 B.R. 302 (Bankr. S.D.N.Y. 2010); *In re Hassen Imps. P'ship* 502 B.R. 851 (Dist. C.D. Cal. 2013) (district court reversed sale order because appellant's interest was a restrictive use covenant or equitable servitude that could not be satisfied by a monetary payment, in contrast to a lien that could be foreclosed and would be compelled to accept a money satisfaction in the form of any remaining sale proceeds from a foreclosure sale). The Opposition inaccurately summarizes the holding and analysis of the district court in *Hassen Imps. P'ship*.

The only case Opposing Creditor cites for his position is an unpublished bankruptcy court memorandum of decision from Oregon. The judge in that case held a chapter 11 debtor-in-possession's motion to sell was an attempt to supplant the plan confirmation process and found that the proposed sale would have violated local

12.

Nazaryan\reply.001

zoning ordinances.  That chapter 11 case in Oregon has absolutely no similarities to Trustee's Sale Motion in the instant Case.

Nowhere in *Clear Channel* did the BAP address non-contractual mechanisms by which a lienholder might get less than full payment yet lose the lien.  The appellees defending the sale free and clear of liens did not argue that there were qualifying legal or equitable proceedings beyond cramdown under Bankruptcy Code Section 1129. Appellees' briefs cited no state statutes, nor any federal statutes except the Bankruptcy Code, nor any cases considering non-bankruptcy legal or equitable procedures which might serve to support the application of 11 U.S.C. §363(f)(5).  *In re Jolan, Inc.*, 403 B.R. 866, 868-69 (Bankr. W.D. Wash. 2009).

The BAP in *Clear Channel* noted that the bankruptcy court made no finding regarding an available type or form of legal or equitable proceeding under nonbankruptcy law in which a court could compel appellant junior lienholder to release its lien for a payment that was less than the full value of its claim.  403 B.R. at 868.  Without any evidence or argument in the record from appellees, and without any findings in the record from the bankruptcy court, the BAP could not affirm the bankruptcy court's sale order based on 11 U.S.C. §363(f)(5).

The instant Case is in direct contrast to *Clear Channel*.  The Sale Motion and this Reply provide the factual and legal record on which this Court can make its findings of fact and conclusions of law to overrule the Opposition and grant the Sale Motion.

As noted by the bankruptcy court in *Jolan*:

> The careful reader will have noted that, after pointing out that appellees had not shown the existence of a qualifying proceeding, the Panel did not continue with

13.

the familiar appellate rubric "nor have we found any such authority." Rather, it exercised its prerogative to limit its ruling to the arguments presented by the parties, as might be expected when it was not evident that they had argued anything but *§1129* to the bankruptcy court: "Accordingly, [appellant] has waived any issue . . . : '[A]n appellate court will not consider issues not properly raised before the [trial] court. Furthermore, on appeal, arguments not raised by a party in its opening brief are deemed waived.'" [citations omitted] 403 B.R. at 869.

**b. This Court Should Apply the "Realistic Possibility" Standard for §363(f)(5) as Described in *Urban Commons***

A recent bankruptcy case decision, *In re Urban Commons 2W. LLC,* 668 B.R. 42 (Bankr. S.D. N.Y. 2025) is directly on point for the instant Case.  The bankruptcy court in *Urban Commons* concluded that the availability of a foreclosure proceeding under state law satisfies 11 U.S.C. §363(f)(5). The court approved the proposed sale free and clear of all liens, claims, and encumbrances.  668 B.R. at 50.  The court's thorough review of the text and statutory context of §363(f)(5) provides particularly helpful and insightful analysis that applies to the instant Case, as discussed *infra*.

**In *Urban Commons*, the bankruptcy court, in approving the sale, understood that to do otherwise would "virtually nullify" §363(f)(5) and undermine the Bankruptcy Code's provisions regarding secured debt.  In the instant Case, the decision before this Court is no less clear.**

The court in *Urban Commons* employed a "realistic possibility" standard that conforms to the (1) text, (2) statutory context, and (3) purpose of the subsection.

The text of §363(f)(5) is written in the passive voice and contains no limitation on who can bring a proceeding to compel such a result.

14.

The statutory context includes 11 U.S.C. §506(a) that focuses on the value of a secured creditor's interest in the subject collateral.  This section bifurcates each secured creditor's claim into a secured portion, equal to the value of the creditor's interest in the subject collateral, and an unsecured portion, for the balance of the amount claimed.

The court also discusses the purpose of §363(f)(5) and that "it makes sense that Congress would have looked to such state law mechanisms [as foreclosure sales and UCC sales] to determine which property interests would be extinguished by a bankruptcy sale—that is, that Congress would have intended *section 363* sales to strip off any interests that state law 'legal or equitable proceeding[s]' such as foreclosure sales and UCC sales would extinguish." *Id*. at 48-50.

The court in *Urban Commons* begins its opinion by recognizing: "This case raises an important and unsettled issue concerning the circumstances in which a debtor [or trustee] may sell its [the estate's] property free and clear of liens and other interests pursuant to Bankruptcy Code § 363(f)(5)."  The court notes that "[m]ost courts . . . have construed section 363(f)(5) broadly, holding that its requirements are satisfied if a foreclosure sale under state law would extinguish the interests at issue." *Id*. at 43-44.

In the sale before the court, a single party, "an out-of-the-money junior lien holder," objected.  The court noted that this single objector was attempting to elevate its "lien holder's rights from those of an unsecured to a secured  creditor, enabling it to . . . . .

15.

Nazaryan\reply.001

demand to be paid as the price of dropping its objection to the sale." *Id.* at 44.

The court noted that §363(f)(5) is often the only available basis for a free and clear sale when estate property is sold for less than the face amount of the liens that encumber it. The court noted that the construction of §363(f)(5) "has a substantial impact on whether section 363 free-and-clear sales of such 'underwater' assets are available widely or, instead, only in rare cases." *Id.* at 46.

The court's analysis notes that for decades, "many courts and commentators considered it settled that section 363(f)(5) made free-and-clear sales widely available because foreclosure sales and UCC sales satisfied that subsection. [citations omitted]" *Id.*

> Indeed, some commentators considered it "axiomatic" that state law foreclosure proceedings "'fall directly within the words'" of *section 363(f)(5)*. Frank A. Oswald & Andy Winchell, *Missing the Forest for the Trees in § 363: How the Ninth Circuit's Bankruptcy Appellate Panel Neglected the Big Picture in the Clear Channel Decision*, 2009 No. 4 Norton Bankr. L. Adviser 2 (2009) (quoting Kuney, Misinterpreting Bankruptcy Code § 363(f), 76 Am. Bankr. L.J. at 252 n. 64); see also Robert M. Lawless, *BAP Prohibits Sale of Free and Clear of an Underwater Junior Lien*, 28 No. 10 Bankr. L. Ltr. 1 (Oct. 2008) ("[A] state court foreclosure proceeding would seem to be a proceeding where the second lienholder could be compelled to accept a monetary satisfaction of its lien and thus satisfy the requirements of (f)(5). Indeed, the word 'foreclosure' means exactly that—the foreclosure of junior interests."). *Id.* at 46-47.

In the instant Case, the Second TD could be foreclosed by the nonjudicial foreclosure sale of AmWest, holder of the First TD, whose lien is senior to the interest of Opposing Creditor in the Real Property. Also, the Second TD could be foreclosed by judicial foreclosure conducted for the L.A. County HERO Lien that is senior to the interest of Opposing Creditor in the Real

16.

Property.  Further, the Second TD could be foreclosed if LAPFCU, under applicable state law, proceeded with a sale of the Real Property to enforce the LAPFCU Lien that is senior to the interest of Opposing Creditor in the Real Property.

In all three of these realistic possibilities, Opposing Creditor, based on the order of priority of the Second TD that is junior to all three of these other lien interests, could be forced to accept any available surplus funds, based on the order of priority of the respective liens, notwithstanding that the funds Opposing Creditor could collect would be less than the amount Opposing Creditor claims he is owed.

**B.**    **The Meaningful Distribution to Unsecured Creditors Proposed by Trustee Compels the Court to Overrule Opposing Creditor's Objection and Approve Trustee's Sale of the Real Property**

Trustee has, and continues to, successfully rebut the presumption against a "carve-out" agreement by satisfying the inquiry that the Ninth Circuit BAP stated in *In re KVN, Corp.*, 514 B.R. 1, 14 (BAP 9th Cir. 2014).  The inquiry consists of the following three questions:

1.    Has the trustee fulfilled his or her basic duties?

2.    Is there a benefit to the estate, that is, prospects for a meaningful distribution to unsecured creditors?

3.    Have the terms of the carve-out agreement been fully disclosed to the bankruptcy court?

If the answer to these questions is in the affirmative, as it is in the instant Case, then the presumption is overcome.

The Chapter 7 Trustee Handbook at 4-14 provides that a trustee may seek a "carve-out" from a secured creditor and sell the subject

17.

Nazaryan\reply.001

property if the "carve-out" will result in a meaningful distribution to creditors. The definition of a "meaningful distribution" is based on the facts and totality of the circumstances of each individual case. There is no defined formula, no specific amount, and no specific percentage to apply. Rather, Trustee applies her business judgment in determining, and the Court exercises its discretion to approve, the meaningful distribution to unsecured creditors in a particular case, such as the instant one.

The stipulation between Trustee and LAPFCU (the "LAPFCU Stipulation") [dkt. no. 46] created the carve-out/assignment of $78,382.31 for the Estate (the "Estate Equity") from the sale of the Real Property. On June 13, 2025, the Court entered its order approving the LAPFCU Stipulation (the "LAPFCU Order") [dkt. no. 57]. Trustee proposes that the amount of $40,000.00 (51%) be set aside for distribution to unsecured creditors from the Estate Equity of $78,382.31. Opposing Creditor alleges that $40,000.00 is a "paltry" sum. Trustee's business judgment is that $40,000.00 is neither small nor meager, and that this amount provides a meaningful distribution to creditors with allowed priority and general unsecured claims in the Case. This distribution is consistent with others that bankruptcy courts approve regularly. In the end, something is better than nothing. This is a basic reality of the bankruptcy process.

Trustee cannot control the number or amount of claims in any particular case, including this one. However, Trustee will provide a meaningful recovery for the Estate from sale of the Real Property following the disaster inflicted by Debtor on his creditors.

18.

Nazaryan\reply.001

Trustee will be able to disburse $40,000.00 to creditors with allowed priority and general unsecured claims.  California Franchise Tax Board has a priority, unsecured claim in the amount of $16,896.20.  The balance of $23,103.80 will be disbursed *pro rata* to the remaining allowed, general unsecured claims.  Again, this distribution is consistent with others that bankruptcy courts approve regularly.  In the end, something for unsecured creditors is better than nothing, and nothing is what Opposing Creditor proposes they receive.

Trustee is informed that all lienholders, except Opposing Creditor, support and consent to the proposed sale.  Even the United States, whose restitution lien is entirely unsecured, does not oppose the sale and will benefit by Trustee's orderly sale of the Real Property as it provides funds in which the United States, as the holder of an unsecured claim (Claim no. 6 in the Case), will share.

C. **Trustee is Entitled to Recover for the Estate the Administrative Expenses and Fees Allowed by 11 U.S.C. §506(c)**

11 U.S.C. §506(c) provides that "[t]he trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property."

In the Sale Motion, Trustee seeks the Court's approval of such costs and expenses, including, without limitation: insurance premium, pool service, repair charges, locksmith charges, gardening/hauling/clean-up services, utility payments, homeowner

19.

association fees, real property taxes, broker commissions, other closing costs necessary and related to disposition of the Real Property through the sale, and additional administrative fees and expenses of the Estate related to preservation and disposition of the Real Property such as special counsel fees of approximately $1,400.00 to follow necessary legal procedures to ensure the property was vacant and undamaged.

The Opposition cites *In re Cascade Hydraulics & Utility Service, Inc.*, 815 F.2d 546 (9th Cir. 1987) in an attempt to limit Trustee's recovery of reasonable and necessary costs of preserving and disposing of the Real Property. *Cascade Hydraulics* was a chapter 11 case in which the debtor-in-possession sought to recover from the secured lender's cash collateral the costs related to the ongoing business operations during the chapter 11 case. That case is in stark contrast to, and has no similarity with, the instant Case.

Trustee only incurred reasonable and absolutely necessary expenses to preserve and dispose of the Real Property. These are expenses, such as insurance, utilities, and maintenance services, that the secured creditors would otherwise have had to incur directly. For example, Trustee was able to remove the invitees for legal fees of $1,400.00 and without any damage to the Real Property; a small sum and an outstanding result compared to what the secured creditors would have incurred to prosecute an unlawful detainer action and the damage that the invitees could have caused to the Real Property. These expenses also include costs of sale that the secured creditors would otherwise have had to pay.

. . . . .

20.

The estimated closing statement attached as Exhibit C to the Sale Motion specifies the amount of the closing costs and expenses to be paid from the sale when the sale escrow closes.  Trustee seeks an additional set aside of $50,000.00 (the "Set Aside") to be available for the payment of other fees and expenses of the Estate for preservation and disposition of the Real Property.  Trustee intends to seek the Court's approval of these other fees and expenses to be paid from the Set Aside pursuant to 11 U.S.C. §506(c) after the sale closes.  *See, e.g., In re Stable Mews Associates,* 49 B.R. 395, 406 (Bankr. S.D. N.Y. 1985) (allowing payment of certain legal fees and trustee fees as costs of preserving or disposing of collateral under §506(c)).

### V.    CONCLUSION

Trustee respectfully requests that the Court overrule the Opposition, grant the Sale Motion, approve payment of administrative fees and expenses per 11 U.S.C. §506(c) through the sale escrow, approve the Set Aside of $50,000.00 from the sale to be made available for additional administrative fees and expenses to be determined after the sale, subject to the Court's approval, and deny Opposing Creditor's motion for relief from stay.

DATED: July 9, 2025

/s/Nancy Hoffmeier Zamora
Nancy Hoffmeier Zamora
Chapter 7 Trustee

21.

Nazaryan\reply.001

**DECLARATION OF NANCY HOFFMEIER ZAMORA**

I, Nancy Hoffmeier Zamora, declare that:

1.    I am the duly-appointed, qualified, acting, and permanent chapter 7 trustee in the above-entitled case.  I am over the age of 18 years.

2.    The following is within my own personal knowledge and, if called upon to testify, I could and would testify competently thereto.  The capitalized terms used herein have the meanings ascribed to them in the Reply to Opposition to "Motion for Order Authorizing Trustee to Sell Real Property Free and Clear of Liens and Interests (Except L.A. County Hero Lien), Subject to Overbid, and Approving Surcharge for Administrative Fees and Expenses per 11 U.S.C. §506(c) (the "Reply") to which this declaration is attached unless otherwise defined.

3.    I reviewed the docket; pleadings and claims filed in the Case; the claims register; real property documents; documents provided to me by Debtor, creditors, and their respective counsel; and other documents related to the subject of the Reply, the Opposition, and the Sale Motion.

4.    Opposing Creditor and Benjamin have a long-time relationship with Debtor and Artur.  Both Debtor and Artur are serving federal prison sentences for conspiracy to commit bank fraud.

5.    Opposing Creditor admits in one of his declarations [see dkt. no. 56 at page 14] that the loan of $1.2 million he made to Debtor and Artur in 2023 was used in large part to pay off the then-existing loan secured by the Real Property (defined below) that was owed to Benjamin through his company, Iled, Inc.  (N.B. In

22.

Nazaryan\reply.001

the escrow statement for the loan escrow, the loan payoff of $506,433.89 was made to Hye Rise Inv., LLC and the deed of trust recorded on January 21, 2022 as instrument no. 20220080259 in Official Records names Hye Rise Inv., LLC as beneficiary.)  On July 9, 2025, I conducted searches at the California Secretary of State's website but I found no information about these entities as owned by Benjamin.

6.    I conducted a business search through the California Secretary of State's website for Iled, Inc. and Hye Rise Inv., LLC. I found no entries for Hye Rise Inv., LLC.  The only entry I found for Iled, Inc. was for a suspended corporation and the only identified officer, director, and agent for service of process is Jixiang Xiong with an address at 16725 Northam Street, La Puente, CA 91744.

7.    In my review of the relevant loan documents, I found that the loan documents stated that Debtor and Artur were to use funds from Opposing Creditor's loan for "business purposes" to pay off debt.  According to the escrow statement for the loan, Opposing Creditor received $24,000.00 in lender's fees from the principal amount of the loan at its inception.  The amount of $292,348.09 was disbursed to borrowers Artur ($40,000.00) and Debtor ($252,348.09) from the loan.  There is no explanation of how these funds were used for "business purposes" in the loan documents that First Counsel transmitted to me.

8.    Opposing Creditor admits in his declaration [see dkt. no. 56 at page 14]  that he only received one payment of $12,000.00 on account of the $1.2 million loan he made.  Until recently, Opposing Creditor made no efforts to collect payments.  He waited for 18

23.

Nazaryan\reply.001

months after the date of the loan, and 4 months after the loan was fully due and payable, to even begin such efforts.

9.    On the petition date of April 14, 2025, First Counsel contacted me about the Case and the Real Property.  First Counsel raised concerns with me about persons who were occupying the Real Property, the condition of the Real Property, Debtor's listing of the Real Property on the MLS, and that Debtor, through third parties, may be causing waste of, or intentional damage to, the Real Property.

10.   I immediately commenced investigation of the Real Property, requested that Debtor's MLS listing be cancelled by Debtor's realtor, contacted Debtor's counsel, contacted Estate Broker to evaluate the Real Property, communicated with the management company for the HOA, obtained real property documents, and conducted other due diligence.

11.   I had to secure and safeguard the Real Property.  I obtained liability and hazard insurance.  Upon confirming that there were "invitees" occupying the Real Property, I engaged special counsel specializing in landlord-tenant and eviction law to follow the necessary procedures to end the invitees' possession of the Real Property and ensure their removal of any of their personal property.

12.   From the commencement of the Case, I communicated with various parties including lienholders and/or their counsel to obtain information about the Real Property as it was obvious Debtor's schedules were inaccurate and unreliable.  I made numerous requests of Debtor's counsel for documents and information, most of which were unavailable or non-existent.

24.

Nazaryan\reply.001

13. I proceeded without delay in order to minimize costs to the Estate and to negotiate one or more "carve-outs" from secured creditors to maximize value for all secured and unsecured creditors in the Case.

14. I negotiated, in good faith, with First Counsel regarding my administration of the Real Property and believed that progress was being made. It was not until the eve of the hearing on Debtor's motion to compel abandonment that there was a sudden shift in attitude by Opposing Creditor when current counsel substituted into the matter. Yet, I believed, based on further communications, that a global resolution with all secured creditors would result in my sale of the Real Property and a benefit to unsecured creditors.

15. On June 25, 2025, I filed the Sale Motion with related notices. The Sales Price is $4,675,000.00, subject to overbid. I propose to sell the Real Property free and clear of all liens and interests, with the exception of the L.A. HERO Lien that buyer will assume pursuant to the terms of the L.A. HERO Lien. I am informed that all of the lienholders, except for Opposing Creditor, have consented to my proposed sale. The deadline for filing an opposition to the Sale Motion was July 2, 2025. Opposing Creditor was the only party who filed an opposition.

16. I negotiated the carve-out/assignment that is memorialized in the LAPFCU Stipulation and that created the Estate Equity of $78,382.31 to be paid from the Sales Price. On June 13, 2025, the Court entered the LAPFCU Order.

17. I propose that the amount of $40,000.00 (51%) be set aside for distribution to unsecured creditors from the Estate Equity of $78,382.31. In my business judgment, $40,000.00 will

25.

Nazaryan\reply.001

provide a meaningful distribution to creditors with allowed priority and general unsecured claims in the Case.

18.   The initial purchase agreement between me, as Trustee, and proposed buyer ("Buyer") would have paid Opposing Creditor approximately $845,000.00 of the principal of his loan (approximately 70%).   Pursuant to my additional efforts and negotiations, the estimated payout to Opposing Creditor is now $1,171,051.01.   This amount, when added to the prior payments Opposing Creditor received, exceeds the full loan principal of $1,200,000.00.

19.   The Sale Motion includes the proposed distributions from the sale to lienholders, including Opposing Creditor.   The distribution to Opposing Creditor from the Sales Price is estimated at approximately $1,171,051.01.   This distribution, when added to the prior payment of $12,000.00 that Opposing Creditor admits he received on or about August 23, 2023 [see paragraph 5 of Movant's declaration at page 14 of dkt. no. 56] and the $24,000.00 "lender's fee" that Opposing Creditor received from the principal of the loan when he made it, exceeds the full principal of $1,200,000.00 stated in the Second TD and the Motion for Relief from Stay [dkt. no. 37].

20.   The sale escrow is to close on the first business day that is at least 15 days after entry of the Sale Order.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on July 9, 2025 at Los Angeles, California.

Nancy Hoffmeier Zamora

26.

Nazaryan\reply.001

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

U.S. Bank Tower, 633 West 5th Street, Suite 2600, Los Angeles, CA 90071

A true and correct copy of the foregoing document entitled (*specify*):

**REPLY TO OPPOSITION TO "MOTION FOR ORDER AUTHORIZING TRUSTEE TO SELL REAL PROPERTY FREE AND CLEAR OF LIENS AND INTERESTS (EXCEPT L.A. COUNTY HERO LIEN), SUBJECT TO OVERBID, AND APPROVING SURCHARGE FOR ADMINISTRATIVE FEES AND EXPENSES PER 11 U.S.C. §506(c)"; SUPPORTING DECLARATION**

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On July 9, 2025, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

United States Trustee: United States Trustee (SV), ustpregion16.wh.ecf@usdoj.gov; Eryk R. Escobar, eryk.r.escobar@usdoj.gov
Trustee: Nancy Zamora, zamora3@aol.com, nzamora@ecf.axosfs.com
Counsel for Debtor: Anita Khachikyan, ak@khachlaw.com
Counsel for Creditors: Raymond H. Aver ray@averlaw.com, averlawfirm@gmail.com;ani@averlaw.com, katya@averlaw.com, jesus@averlaw.com; Sanaz Sarah Bereliani, berelianilaw@gmail.com, chris@berelianilaw.com, r48595@notify.bestcase.com; Shannon A. Doyle, sdoyle@ghidottiberger.com, bknotifications@ghidottiberger.com; Bruce P. Needleman, attybpn@aol.com; Elan S. Levey, elan.levey@usdoj.gov, julie.morales@usdoj.gov, caseview.ecf@usdoj.gov, usacac.tax@usdoj.gov
Counsel for Defendant Vanecian: Michael G. D'Alba, mgd@lnbyg.com

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On July 9, 2025, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Judge's copy waived per Judge's procedures

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on July 9, 2025, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| July 9, 2025 | Cynthia Casas | /s/ Cynthia Casas |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**